UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
                                                                    :
LONSTEIN LAW OFFICE, P.C., JULIE LONSTEIN,                          :
WAYNE D. LONSTEIN,                                                  :
                                                                    :
                          Plaintiffs,                               :
                                                                    :
            -v-                                                     :
                                                                    :
EVANSTON INSURANCE COMPANY, MARKEL                                  :
SERVICE INCORPORATED, AT&T SERVICES, INC.,                         :
                                                                    :
                          Defendants.                               :
                                                                    :
--------------------------------------------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____           │
│ DATE FILED:__1/6/2022___         │
└─────────────────────────────────┘
```

20-cv-9712 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendant AT&T Services, Inc. ("AT&T") moves to compel arbitration, pursuant to the

Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*  Dkt. No. 51.

For the following reasons, the motion is granted, and the case against AT&T is stayed.

## BACKGROUND

The court applies "a standard 'similar to that applicable for a motion for summary

judgment'" in deciding a motion to compel arbitration.  *Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d

374, 390 (S.D.N.Y. Jan. 19, 2021) (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir.

2017)).  The court may consider "all relevant, admissible evidence submitted by the parties and

contained in pleadings, depositions, answers to interrogatories, and admissions on file, together

with affidavits."  *Meyer*, 868 F.3d at 74.

Plaintiff Lonstein Law Office, P.C. ("LLO" and together with Julie and Wayne Lonstein

("Plaintiffs")) is a law firm located in Ellenville, New York.  Dkt. No. 27 ("Compl.") ¶ 2.  Julie

C. Lonstein and Wayne D. Lonstein are the principals of LLO.  Dkt. No. 55-2 at 1.  AT&T is the

successor-in-interest to DirecTV, Inc.  Compl. ¶ 11.  The complaint defines AT&T, as successor-

in-interest to DirectTV, Inc., as "DIRECTV," and the allegations of the complaint recited herein use the same definition unless otherwise noted.  *Id.*

## I.     The Relationship Between LLO and DIRECTTV/AT&T

Beginning in 2006, LLO was retained by DIRECTV to identify, investigate, and bring claims and/or civil actions against businesses or individuals throughout the United States who illegally acquired DIRECTV services, either by acquiring it without payment or by misrepresenting that they were individuals when in fact the services were actually being received and exhibited in a commercial establishment.  *Id.* ¶ 17.  LLO's agreement to provide these services to DIRECTV was documented in a retainer agreement (the "Retainer Agreement") between LLO and DIRECTV dated on or about October 2, 2009.  *Id.* ¶ 18.  Pursuant to the Retainer Agreement, DIRECTV retained LLO (defined as "ATTORNEYS" therein) to represent it "in the investigation and litigation of claims against individuals and entities for the commercial misuse and unauthorized exhibition of DIRECTV satellite programming services" in exchange for a contingency fee.  Dkt. No. 55-1 at 1.  The parties agreed that they would share equally the costs of auditing and investigation fees incurred in the documentation of fraud, misuse, and/or piracy through the efforts of an outside firm, Signal Auditing, Inc., and that LLO could pay DIRECTV's share from client funds it was permitted to hold in trust.  *Id.* at 2.[1]  LLO was required to obtain DIRECTV's approval on a case-by-case basis prior to filing any lawsuit, *id.* at 1, and was further required to maintain professional liability coverage with minimum limits of $1 million "per occurrence," *id.* at 3.  DIRECTV represented to LLO that it had "the rights upon which it is basing its claims of infringement, misuse or piracy."  *Id.* at 1.

---

[1] To the extent that AT&T seeks the sealing of information contained in this Opinion, Dkt. No. 54, the Court denies that request.  The Court presently takes no view on the propriety of sealing other information referenced in that motion.

In addition, the Retainer Agreement has a mutual indemnification provision.  As relevant here, DIRECTV agrees to

> indemnify, defend and hold [LLO], its officers, directors, employees, agents and affiliates harmless from any and all costs, expenses, liability, claims, judgments, lawsuits and demands related to the litigation of commercial misuse and fraud claims if [DIRECTV's] representations regarding programming rights form the bases of the claims of misuse and fraud are determined to be invalid.

*Id.* at 3; Compl. ¶ 19.

The Retainer Agreement is terminable by either party, with or without cause, on 14-days prior notice to the other party.  Dkt. No. 55-1 at 2.  It is signed by Julie C. Lonstein on behalf of LLO.  *Id.* at 4.

On or about February 15, 2019, Plaintiffs entered into a wind-down agreement (the "Wind Down Agreement") with AT&T, as successor to DIRECTV.  Compl. ¶ 20; *see also* Dkt. No. 55-2.[2]  The Wind Down Agreement recognized that AT&T "has retained LLO over the past twelve years to assist with detecting commercial misuse of DIRECTV residential programming and converting commercially-misused residential accounts to proper commercial accounts" but states that such program is being discontinued.  Dkt. No. 55-2 at 1.  For a one-time non-refundable payment from AT&T, LLO agreed to continue to represent AT&T during a one-year period following the effective date of the Wind Down Agreement.  *Id.* at 2–3.  The Wind Down Agreement superseded all prior agreements between the parties.  *Id.* § 12.01 ("The terms and conditions of this Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof, and this Agreement supersedes all prior agreements, understandings, and representations by or between the Parties, whether written or oral, to the extent they relate to

---

[2] The name AT&T is used to identify the party to the Wind Down Agreement with LLO and is therefore used in the Court's description of that agreement.

the subject matter hereof").  Section 5.01 of the Wind Down Agreement contains a mutual

release by the parties of claims that they might have against one or another:

> LLO and AT&T, each on behalf of itself and its Affiliates and their respective
> predecessors, successors, parents, subsidiaries, assigns, agents, attorneys, directors,
> officers, partners, employees and their heirs and executors do hereby fully,
> irrevocably and unconditionally release, acquit and forever discharge (*i*) the other
> Party, (*ii*) its Affiliates, and (*iii*) their respective predecessors, successors, parents,
> subsidiaries, assigns and their agents, attorneys, directors, officers, partners,
> employees, insurers, users, customers, distributors, retailers, suppliers and their
> heirs and executors from any and all actions, causes of action, claims or demands,
> liabilities, damages, attorneys' fees, court costs, or any other form of claim or
> compensation, at law, in equity, or otherwise, known or unknown, contingent or
> fixed, suspected or unsuspected, relating to, based upon, or arising out of (1) any
> prior agreement between the Parties or (2) the AT&T Commercial Misuse Program
> or (3) any other relationship, obligation, arrangement, facts, or circumstances,
> through and including the Effective Date of this Agreement.  Notwithstanding the
> foregoing, any and all claims for indemnification arising from any prior agreement
> or obligation between the Parties are excluded from Article 5.

*Id.* § 5.01.  The parties here agree that the indemnification obligation in the Retainer Agreement

is encompassed by the last sentence of Section 5.01.

The Wind Down Agreement also contains a broad arbitration clause.  Section 12.07,

entitled Dispute Resolution, provides as follows:

> Any and all controversies or claims of any nature arising out of or relating to this
> Agreement or the breach, termination or validity thereof, whether based on
> contract, tort, statute, fraud, misrepresentation or any other legal or equitable
> theory (the "Claim") shall be resolved solely and exclusively by binding, individual
> arbitration administered by the American Arbitration Association ("AAA") in
> accordance with the provisions of this paragraph and the AAA Commercial
> Arbitration Rules to the extent such rules do not conflict with this paragraph and
> Agreement.  The arbitrator shall strictly limit discovery to the production of
> documents directly relevant to the parties' claims and defenses and, if depositions
> are required, each Party shall be limited to three (3) depositions.  The arbitrator
> shall issue an order preventing the Parties, AAA and any other participants to the
> arbitration from disclosing to any third party any information obtained via the
> arbitration, including discovery documents, evidence, testimony and the award
> except as may be required by law.  All requests for injunctive or declaratory relief
> shall be decided by the arbitrator; provided, however, that requests for temporary
> injunctive relief may be submitted to a court of competent jurisdiction if the
> arbitrator has not yet been appointed.  Any injunctive or declaratory relief granted
> by the arbitrator shall be on behalf of a Party only; no form of representative, class,

multi-party, public, or private attorney general injunctive relief may be advanced, considered, or awarded. If, after the exhaustion of all appeals, any of these prohibitions on non- individualized injunctive or declaratory relief are found to be unenforceable with respect to a particular claim or request for relief, then that claim or request for relief shall be severed and decided by a court, and all other claims and requests for relief shall be arbitrated. The arbitrator shall not limit, expand or otherwise modify the terms of this Agreement and shall not award punitive or other damages in excess of compensatory damages. Each Party shall bear its own expenses, but those related to the compensation of the arbitrator shall be borne equally.

*Id.* § 12.07.

The Wind Down Agreement was signed on February 15, 2019 by Wayne D. Lonstein and Julie C. Lonstein individually and on behalf of LLO, and it was signed on February 19, 2019 by AT&T. *Id.* at 12.

## II.    The Lawsuits Against DIRECTV and LLO

During the term of the Retainer Agreement, Plaintiffs were named, sometimes alongside DIRECTV, in four lawsuits relating to the actions by Plaintiffs and DIRECTV in asserting DIRECTV's programming rights (the "Actions").[3]

### A.    The Roberson Action

On or about July 10, 2013, Brandon Roberson, Julie Roberson, and ELR Dreams, LLC, among others ("the Roberson Plaintiffs"), commenced an action in Texas state court in the District Court of the 68th Judicial District of Dallas County, Texas ("Roberson Action"). Compl.

---

[3] The contents of the complaints in the Actions are properly before the Court for what they allege, but not for their truth, both because they are referred to and relied upon by the complaint, Compl. ¶ 40 ("A comparison of the claims asserted in each Action demonstrates that the basic elements of each of the Actions is separate and distinct."), and thus are incorporated by reference, *see Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020), *aff'd by* 847 F. App'x 35 (2d Cir. 2021) (summary order); *see also Wesco*, 847 F. App'x at 38 n.4 ("Because the Proxy is incorporated by reference into the complaint, we may properly take into account at this motion to dismiss stage."), and because the Court can take judicial notice of the complaints as public records pursuant to Federal Rule of Evidence 201(b), *see Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000).

¶ 27.   The Roberson Plaintiffs are small-business owners who allege that, after signing up for what they understood to be the appropriate DirecTV service for their restaurant in Mesquite, Texas, they had their service cut off and received in June 2013 a "threatening" letter from LLO accusing them of fraud and of willfully violating a federal statute.  Dkt. No. 49-1 ¶ 19.  The letter allegedly demanded that the Roberson Plaintiffs pay $15,000, which could be reduced to $12,000 if they signed up for a new commercial subscription for DirecTV.  *Id.*  The Roberson Action alleges claims of common law fraud, fraud by non-disclosure, conspiracy, and violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, against LLO and DirecTV, LLC.  *See* Dkt. No. 49-1.  The Roberson Action also alleges that after receiving the letter from LLO:

> Mr. Roberson researched this issue and discovered [DirecTV] and [LLO] have a history and pattern of authorizing and/or tacitly approving of: [DirecTV] installers signing up small businesses (café's, bars, etc.) under non-commercial packages without explaining that a commercial package even exists; waiting until the services is [sic] up and running; sending out an investigator; and then essentially blackmailing the customer to pay large fines and/or signing up for commercial service in order to reduce the fine.

*Id.* ¶ 21.

> The Roberson Action alleges, upon information and belief, that:

> [LLO] and [DirecTV] have willfully engaged in a pattern of either directing and/or tacitly approving of directing [DirecTV] callers to (and/or tacitly approving the pattern of customers going directly to) authorized retailers and/or installers to set up non-commercial service at small businesses without disclosing the difference between commercial and non-commercial accounts and without disclosing the fact that there even is more than one type of [DirecTV] service.

*Id.* ¶ 22.

The complaint in the Roberson Action goes on to allege, upon information and belief, that LLO and DirecTV "concocted and acted pursuant to a scheme" under which after DirecTV induced a customer to sign up with a non-commercial service, LLO would "send an intimidating

letter accusing the person of fraud and of violating US law, for which, despite these customers'
honest protests that they had no idea that they had a non-commercial package at their small
establishment, the customer is nevertheless statutorily obligated to pay" and "demanding large
sums to make these daunting legal issues disappear." *Id*. The Roberson Action complaint also
alleges that DirecTV and LLO are continuously engaged in this "coordinated scheme or plan to
exact unearned fees from comparatively weak unsuspecting small commercial enterprises," *id*. ¶
23, and that their conduct also is "a knowing violation of a prior settlement with the Attorney
General [o]f Texas," *id*. ¶ 24. The Roberson Action complaint alleges that LLO had "either
concocted the scheme . . . or tacitly approved and benefited from the scheme" and that it had "a
reputation of raking in hefty paychecks through countless default judgments with factual
scenarios almost analogous to the current one, some of which even raised suspicion with judges."
*Id*. ¶ 36. The RICO claim alleges a pattern of activity that includes the extortion of other
DirecTV customers including in Maine, Indiana, Ohio, and Texas. *Id*. ¶ 50. Among other relief,
the Roberson Action sought multiple and exemplary damages from LLO and DirecTV including
on the grounds that the pair had engaged in an illegal pattern of behavior and had "already
extracted unearned fees from unwary Texans and people from other states and will continue to
do so unless stopped." *Id*. ¶ 59.

> **B.      The Joaquin Action**

On or about November 20, 2015, Angela Joaquin ("Joaquin") commenced an action in the
United States District Court for the District of New Jersey ("Joaquin Action"). Compl. ¶ 28.
According to her complaint, Joaquin is the owner of a beauty salon in New Brunswick, New
Jersey. Dkt. No. 49-2 ¶ 26. She alleges that after contracting to continue to receive the same
satellite cable television services directly from DirecTV that she had previously obtained as part
of a bundle of services, and without ever being told that the services were for a residential

account, in August 2015, she received two successive letters from LLO that accused her of the unauthorized receipt and commercial display of DirecTV programming in violation of federal law and DirecTV customer agreements and threatened her with prosecution and/or litigation. *Id.* ¶¶ 38–41, 44. The second letter threatened prosecution and/or litigation if Joaquin did not pay $10,000 or $7,500 and become a business subscriber of DirecTV. *Id.* ¶ 44.

Joaquin brings her case only against LLO, Julie C. Lonstein, and Wayne Lonstein (referred to in her complaint as the "Lonstein Defendants") and Signal Auditing, Inc. and its Chief Operating Officer and brings her case as a class action on behalf of:

> All owners of New Jersey businesses who, at any time on or after September 9, 2010, were sent correspondence by the Lonstein Defendants regarding allegedly unauthorized use by the business of residential or non-commercial DirecTV satellite television services, and whose DirecTV service was installed at the business location and authorized for a residential or non-commercial account.

*Id.* ¶ 49.

She alleges that "[a]s a matter of policy and routine practice," the Lonstein Defendants send letters to business who have non-commercial subscriptions, accusing the businesses of violating federal law through the unauthorized receipt of DirecTV's "signal for commercial use, threatening lawsuits and/or prosecution, and [demanding] large monetary settlements." *Id.* ¶ 19. According to Joaquin's complaint, this is so even though most of those businesses were authorized to receive DirecTV at their establishments using non-commercial subscriptions, and the defendants knew or should have known this but acted with callous disregard of the fact that the business was authorized to receive the service with a non-commercial subscription. *Id.* ¶¶ 20, 23–24. Joaquin alleges that the defendants have violated the New Jersey Consumer Fraud Act and the New Jersey RICO statute. *See id.* The complaint attaches and relies in part on the affidavit of an installer who installed a DirecTV satellite for an Indiana customer. *See id.*, Ex. A.

C.       **The Perez Action**

On or about August 4, 2016, a lawsuit was commenced in the United States District

Court for the Central District of California by Doneyda Perez ("Perez"), Danny and Marlys

Nissen ("the Nissens"), Joseph Angelo ("Angelo"), Gregory Laplante ("Laplante"), and Paul

Holt ("Holt") (the "Perez Action").  Compl. ¶ 25; Dkt. No. 49-3.  According to the complaint in

the Perez Action, Perez was the owner of a small business in Garden Grove, California, Dkt. No.

49-3 ¶ 28; the Nissens are owners of a small business in Washburn, Iowa, *id.* ¶ 29; Angelo is the

owner of a small business in Newport Beach, California, *id.* ¶ 30; Laplante is the owner of a

small business in Redlands, California, *id.* ¶ 31; and Holt is the owner of a small business in

Fordyce, Arkansas, *id.* ¶ 32.  They sue on behalf of a nationwide class of "[a]ll businesses and/or

business owners in the United States" who: were contacted or solicited by DirecTV or its

authorized agents; had residential DirecTV services improperly installed in their commercial

establishments; were audited by Signal Auditing, Inc.; and at any time from August 2012

forward received communications from LLO, Julie Lonstein, or Wayne Lonstein seeking money

for the alleged unauthorized use by their businesses of DirecTV licensed programming.  *Id.* ¶ 69.

The Perez Action complaint names as defendants DirecTV Group Holdings, LLC, LLO, Julie C.

Lonstein, Wayne M. Lonstein, and Signal Auditing, Inc., and it alleges a violation of the RICO

Act.  *See* Dkt. No. 49-3.

The Perez Action alleges that, after DirecTV induces small businesses to purchase its

satellite cable services at a special rate to broadcast in their commercial establishments and then

internally designates the accounts as residential, LLO and the Lonsteins "initiate telephone calls

and letters . . . to threaten these small business owners with credit reporting, 'owed' debts, and

sham litigation unless they pay outrageous sums of money."  *Id.* ¶ 52.  The business owners are

offered two choices—either pay a high flat rate and be "done with the matter" or pay a lesser flat

9

amount and sign up for an extended contract for a DirecTV commercial account at a higher monthly rate on a continuous basis.  *Id.* ¶ 53.  The Perez Action complaint further alleges that LLO and the Lonsteins make "repeated factual and legal misrepresentations to the business owners" that they violated state and federal law, *id.* ¶ 56, and that the "conduct occurred consistently throughout the United States from at least four years preceding the filing of the initial complaint in this matter and continue to the present," *id.* ¶ 58.

D.    **The US Nails Action**

Finally, on or about November 23, 2016, Thu Hone Thi Nguyen a/k/a Thu-Thuy Nguyen individually and d/b/a US Nails commenced a third-party action against LLO, Julie C. Lonstein, and Signal Auditing, Inc., in the United States District Court for the Northern District of Georgia ("US Nails Action").  Compl. ¶ 26; Dkt. No. 49-4.  The US Nails Action is brought on behalf of a putative class that includes:

> [a]ll small business owners in the State of Georgia who, at any time on or after the day four years prior to the date on which this Class Action Counterclaim is filed [August 2016], purchased satellite cable television services provided by [DirecTV] for use in connection with business and were subsequently sent correspondence [by LLO and Julie Lonstein] regarding unauthorized use of said satellite cable television service.

Dkt. No. 49-4 ¶ 79.  It alleges violations of the federal RICO Act and the Georgia Fair Business Practice Act.  Dkt. No. 49-4.

The allegations of the US Nails Action are similar to the allegations in the Roberson, Joaquin, and Perez Actions.  It claims that:  DirecTV targeted small business owners and sold them satellite service for their commercial establishments without telling them that the service was designated residential, *see generally id.*; that LLO and Julie Lonstein hire Signal Auditing, Inc. to send auditors/investigators to find consumers they believe may have been given residential and not commercial programming; and that LLO and Julie Lonstein, without the

10

requisite investigation, sends threatening form letters to the Georgia consumers, requesting significant sums of money for alleged violations of the Federal Communications Act, 47 U.S.C. § 605.  Dkt. No. 49-4 ¶ 43.

All but the Perez Action have since been settled or dismissed.  *See* Dkt. No. 50 at 4; Dkt. No. 58 at 5.  The Roberson Action was dismissed on or about August 17, 2015.  Compl. ¶ 27 n.2. US Nails Action was dismissed on or about May 12, 2017.  *Id.* ¶ 26 n.1.  The parties agree that the Joaquin Action has been either settled or dismissed.  Dkt. No. 50 at 4; Dkt. No. 58 at 5.

## III.    The Insurance Dispute

Plaintiffs are parties to Insurance Policy No. LA806580 with Evanston Insurance Company  ("EIC") providing professional malpractice coverage for the claims period June 1, 2013 to June 1, 2014 (the "Policy").  Compl. ¶ 22.  The Policy provides coverage of $1 million per occurrence less a deductible subject to an aggregate limit of liability of $3 million.  Dkt. No. 8-1 at 3.

Plaintiffs tendered and timely provided written notice of the Actions to EIC, which then provided for Plaintiff's legal representation in the Actions.  Compl. ¶¶ 29–30.  By letter dated July 31, 2020, however, EIC notified Plaintiffs that the Policy limit of $1 million was exceeded by the payment of legal fees and/or expenses and that Evanston's obligations pursuant to the Policy had expired (the "July 31, 2020 Letter").  *Id.* ¶ 32.  The July 31, 2020 Letter asserted "that each of the Actions ar[ose] out of a series of related Wrongful Actions" and that, as a result, "the Actions should be treated as a single claim/occurrence as defined in the Policy," subject to the $1 million limits of liability.  *Id.* ¶ 33.  At the time of the July 31, 2020 Letter, the law firm of Lewis Brisbois was actively engaged as Plaintiffs' counsel in the Perez Action and the Joaquin Action. *Id.* ¶¶ 30, 34.  Pursuant to the July 31, 2020 Letter, EIC refused to pay invoices from Lewis Brisbois in the amount of $42,153.05.  *Id.* ¶ 43.  Lewis Brisbois also has remitted to Plaintiffs

invoices for an additional $59,604.30 for defense costs, *id.* ¶ 44, and it is claiming the approximate sum of $200,000 remains due and outstanding in connection with its representation of LLO in the Actions, *id.* ¶ 45.

Plaintiffs seek indemnification from DIRECTV in the Actions.  They allege that have demanded that DIRECTV indemnify and defend Plaintiffs, *id.* ¶ 71, but that DIRECTV has nonetheless refused to do so, breaching its obligations under the Retainer Agreement "to indemnify, defend and hold Plaintiff[s] harmless from any and all costs, expenses, liability, claims judgments, lawsuits and demands related to the litigation of commercial misuse and fraud claims," *id.* ¶ 75; *see also id.* ¶ 76.  Plaintiffs bring claims for breach of contract and breach of good faith and fair dealing, *id.* ¶¶ 73–78, 82–83, and seek a judgment declaring that DIRECTV is obligated to defend and indemnify Plaintiffs against the claims that are asserted in the Actions, *id.* ¶¶ 69–72, as well as an order of specific performance against DIRECTV, *id.* ¶¶ 79–81.

## PROCEDURAL HISTORY

Plaintiffs commenced this action by complaint filed against EIC and Markel Service Incorporated ("Markel") on November 18, 2020.  Dkt. No. 1.  The complaint brought claims for breach of contract and breach of the duty of good faith and fair dealing against these defendants for failure to pay defense costs under the Policy.  *Id.*  It sought a declaratory judgment that defendants were obligated to pay under the Policy up to the aggregate limits of liability of $3 million, as well as specific performance.  *Id.*  On November 20, 2020, LLO filed an amended complaint against EIC and Merkel containing the same causes of action.  Dkt. No. 8.  AT&T was not named in either the original complaint or in the amended complaint.

On May 10, 2021, Plaintiffs filed a second amended complaint, which is the operative complaint in this action (the "Complaint"), adding AT&T as a defendant.[4]  On June 28, 2021, EIC and Markel filed a motion to dismiss the Complaint for failure to state a claim for relief.  Dkt. No. 48.  Plaintiffs filed a memorandum of law in opposition to that motion on July 16, 2021, Dkt. No. 58, and EIC and Markel filed a reply memorandum of law in further support of the motion to dismiss on July 30, 2021, Dkt. No. 60.  AT&T filed this motion to compel arbitration on July 6, 2021.  Dkt. No. 51.  Plaintiffs filed a response in opposition to the motion to compel arbitration on July 28, 2021, Dkt. No. 59, and AT&T filed a reply memorandum of law in further support of its motion to compel arbitration on August 10, 2021, Dkt. No. 62.[5]

## DISCUSSION

Section 3 of the FAA provides that:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issues involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.

9 U.S.C. § 3.  Under Section 4 of the FAA, "[a]ny party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may seek "an order directing that such arbitration proceed in the manner provided for in such agreement."  *Id.* § 4.

Section 2 of the FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at

---

[4] Plaintiffs attempted to file the second amended complaint on April 19, 2019, after the deadline set by the Court for the filing of the amended complaint.  Dkt. Nos. 22, 26.  The Court gave Plaintiffs leave to refile by May 11, 2011.  Dkt. No. 26.

[5] On August 30, 2021, this case was reassigned from the Hon. Mary Kay Vsykocil to the Hon. Alison J. Nathan.  On December 10, 2021, the case was reassigned to the undersigned.

law or in equity for the revocation of any contract." *Id.* § 2.  The Supreme Court has described

Section 2 as "reflecting both a 'liberal federal policy favoring arbitration,' and the 'fundamental

principle that arbitration is a matter of contract.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S.

333, 339 (2011) (quoting *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S.

1, 24 (1983); *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)).

   The Court's role on a motion to compel arbitration is "narrow."  *John Hancock Mut. Life

Ins. Co. v. Olick*, 151 F.3d 132, 139 (3d Cir. 1998).  The Court first asks whether the parties

entered a valid arbitration agreement.  *See Credit Suisse AG v. Graham*, 533 F. Supp. 3d 122,

130–31 (S.D.N.Y. 2021).  It then asks whether the dispute between the parties falls within the

arbitration agreement.  *Id.* at 131.  "Where . . . the parties clearly and unmistakably agree that the

arbitrators are to determine the threshold question of arbitrability, the court's role is even more

limited.  'The courts must respect the parties' decision' and refer the parties to arbitration even if

the claim for arbitration is 'wholly groundless.'"  *Id.* (alteration adopted) (quoting *Henry Schein,

Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 531 (2019)).  "At least three questions, like

layers in a *matryoshka* doll, might arise in an arbitration dispute.  Starting at the interior and

moving outwards, those are: '1) the merits of the dispute; 2) whether the dispute is to be

arbitrated—the so called "question of arbitrability"; and 3) whether a court or an arbitrator is to

decide the question of arbitrability.'"  *Pacelli v. Augustus Intelligence, Inc.*, 459 F. Supp. 3d 597,

605 (S.D.N.Y. 2020) (quoting *VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities

Partners II L.P.*, 717 F.3d 322, 325 (2d Cir. 2013)).

   Plaintiffs do not dispute that there is a valid arbitration agreement between LLO and

AT&T.  They affirmatively allege that they entered into the Wind Down Agreement with AT&T,

which contains a broad arbitration provision.  Compl. ¶ 20.  They do not identify any "generally

applicable contract defenses, such as fraud, duress, or unconscionability," that could invalidate the arbitration agreement. *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). Wayne D. Lonstein and Julie C. Lonstein also do not dispute that the arbitration clause is binding upon them. The Wind Down Agreement is between AT&T and LLO and Wayne D. Lonstein and Julie C. Lonstein. Dkt. No. 55-2. It is signed individually by Wayne D. Lonstein and Julie C. Lonstein. *Id.*

The arbitration clause in the Wind Down Agreement vests in the arbitration panel in the first instance the decision whether any particular dispute falls within that clause and should be subject to arbitration. The Wind Down Agreement explicitly incorporates the rules of the AAA; it provides that:

> Any and all controversies or claims of any nature arising out of or relating to this Agreement . . . shall be resolved solely and exclusively by binding, individual arbitration administered by the American Arbitration Association ("AAA") in accordance with the provisions of this paragraph and *the AAA Commercial Arbitration Rules* to the extent such rules do not conflict with this paragraph and Agreement.

Dkt. No. 55-2 § 12.07 (emphasis added). The Second Circuit has noted that "Rule 7 of the AAA Commercial Arbitration Rules states with respect to jurisdiction that '[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.'" *Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (quoting AAA Rule R-7(a)). The arbitration clause between Plaintiffs and AT&T "thus vests in the arbitrator the decision whether this dispute falls within the scope of the arbitration clause. '[A] signatory to a contract containing an arbitration clause and incorporating by reference the AAA Rules' may not 'disown its agreed-to obligation to arbitrate all disputes, including the question of arbitrability.'" *Convergen Energy LLC v.*

*Brooks*, 2020 WL 5549039, at *16 (S.D.N.Y. Sept. 16, 2020) (quoting *Contec Corp.*, 398 F.3d at 211, and citing other authorities).

The dispute between Plaintiffs and AT&T at least arguably relates to the Wind Down Agreement and its termination.  The decision whether the dispute does fall within the arbitration clause and whether the matter should be subject to arbitration is for the arbitrators themselves.  It is not for this Court in the first instance, to decide whether the dispute falls within the scope of the arbitration provision in the Wind Down Agreement.  AT&T is entitled to an order compelling arbitration.

Plaintiffs argue that they should not be remitted to arbitration because their claim to arbitration does not "arise[] out of the terms of the Wind Down Agreement."  Dkt. No. 59 at 7.  They note that the Wind Down Agreement does not contain an indemnification clause and that the Retainer Agreement, which does contain the indemnification provision, does not contain an arbitration clause.  *Id.* at 6–7.  That argument is of no avail for two reasons.  First, since there is a valid and enforceable arbitration agreement between the parties and since the parties agreed that the arbitrator—and not a court—would decide the scope of that provision, Plaintiffs are making their argument in the wrong tribunal.  Plaintiffs agreed that the arbitrators would have the right to determine whether any particular dispute fell within the terms of the clause or not.   Having made that bargain, Plaintiffs must convince the arbitrators, and not this Court, that the dispute should not be arbitrated.

Second, the particular argument Plaintiffs make in this Court fails on its own terms.  The arbitration provision in the Wind Down Agreement is not limited to disputes that "arise" from the Wind Down Agreement but also those that "relate" to it.  As the Court has observed in a related context, "[t]his language of 'all disputes' 'arising under or relating to' constitutes 'the

paradigm of a broad' arbitration agreement." *Convergen Energy LLC*, 2020 WL 5549039, at

*16 (quoting *Offshore Expl. & Prod. LLC v. Morgan Stanley Private Bank, N.A.*, 986 F. Supp.

2d 308, 316 (S.D.N.Y. 2013), *aff'd*, 626 F. App'x 303 (2d Cir. 2015) (summary order)). Thus,

while it ultimately will be up to the arbitrators to decide whether this dispute falls within the

terms of the arbitration provision in the Wind Down Agreement, Plaintiffs' argument that the

current dispute does not arise from the Wind Down Agreement is no answer to AT&T's

argument that it relates to the Wind Down Agreement.[6]

## CONCLUSION

"[T]he Federal Arbitration Act, 9 U.S.C. § 1 *et seq*, requires a stay of proceedings when

all claims are referred to arbitration and a stay requested." *Katz v. Cellco P'ship*, 794 F.3d 341,

343 (2d Cir.), *cert. denied*, 136 U.S. 596 (2015).  AT&T has moved for a stay, Dkt. No. 52 at 17,

and Plaintiffs do not oppose a stay.  Accordingly, the Court will stay this matter until the

---

[6] At oral argument, Plaintiffs made arguments why the current dispute does not relate to the
Wind Down Agreement; the force of those arguments will be for the arbitrator.  In a pre-motion
letter, Plaintiffs also argued that arbitration was improper because the other defendants in this
case are not parties to the Wind Down Agreement. Dkt. No. 38 at 3.  Plaintiffs do not renew that
argument in their opposition, and it thus is deemed abandoned.  *See Romeo & Juliette Laser Hair
Removal, Inc. v. Assara I LLC*, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the
motion to dismiss stage, where review is limited to the pleadings, a plaintiff abandons a claim by
failing to address the defendant's arguments in support of dismissing that claim."); *Sullivan v.
City of New York*, 2015 WL 5025296, at *4 (S.D.N.Y. Aug 25, 2015) (explaining that a court
"could properly deem a represented party to have abandoned claims if, in opposing a motion to
dismiss multiple claims, it addressed only some of them").  In any event, the argument is without
merit.  The Supreme Court has squarely held that a party cannot avoid its obligations under an
arbitration agreement by the expedient of joining in the lawsuit parties who are not bound by that
agreement.  *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985) (explaining that
courts must generally "rigorously enforce agreements to arbitrate, even if the result is
'piecemeal' litigation"); *see also KPMG LLP v. Cocchi*, 565 U.S. 18, 19 (2011) ("[I]f a dispute
presents multiple claims, some arbitrable and some not, the former must be sent to arbitration
even if this will lead to piecemeal litigation."); *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*
58 F.3d 16, 20 (2d Cir. 1995) (same).

arbitration is completed. *See, e.g.*, *Cornelius v. Wells Fargo Bank, N.A.*, 2020 WL 1809324, at *8 (S.D.N.Y. Apr. 8, 2020).

The motion to compel arbitration is GRANTED, and the case against AT&T is stayed. The parties shall provide a status report to the Court on the status of the arbitration ninety (90) days from the date of this Opinion and Order and then every additional 90 days thereafter.

The Clerk of Court is respectfully directed to close Dkt. No. 51.

SO ORDERED.

Dated: January 6, 2022
New York, New York

LEWIS J. LIMAN
United States District Judge

18