UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                   :
LONSTEIN LAW OFFICE, P.C., JULIE LONSTEIN,                         :
WAYNE D. LONSTEIN,                                                 :
                                                                   :
                                    Plaintiffs,                    :          20-cv-9712 (LJL)
                                                                   :
                  -v-                                              :          OPINION AND ORDER
                                                                   :
EVANSTON INSURANCE COMPANY, MARKEL                                 :
SERVICE INCORPORATED, AT&T SERVICES, INC.,                         :
                                                                   :
                                    Defendants.                    :
                                                                   :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

        Defendants Evanston Insurance Company ("EIC") and Markel Service Incorporated

("Markel") move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint

for failure to state a claim for relief.

**BACKGROUND**

        The Court accepts the well-pleaded allegations of the complaint and the documents

incorporated by reference as true on this motion to dismiss.

**I.      The Relationship Between LLO and DIRECTV**

        This lawsuit arises out of work conducted by Plaintiff Lonstein Law Office, P.C.

("LLO"), Julie C. Lonstein, and Wayne D. Lonstein (together, "Plaintiffs"), ostensibly in their

capacity as attorneys for DirecTV, Inc.  LLO is a law firm located in Ellenville, New York.  Dkt.

No. 27 ("Compl.") ¶ 2.  Julie C. Lonstein and Wayne D. Lonstein are its principals.  Dkt. No. 55-

2 at 1.  AT&T is the successor-in-interest to DirecTV, Inc.  Compl. ¶ 11.  The complaint defines

AT&T, as successor-in-interest to DirecTV, Inc., as "DIRECTV," *id.*, and the allegations of the

complaint recited herein use the same definition.

"At all times relevant hereto, DIRECTV was . . . engaged in the business of acquiring, promoting, selling and distributing digital entertainment (i.e. broadcast and premium television programming), primarily through satellite transmission to residential and commercial subscribers throughout the United States . . . ." *Id.* ¶ 14.  It was critical to DIRECTV's business to maintain strict controls to ensure that commercial establishments and residential accounts were designated correctly, because DIRECTV does not have the right to provide residential programming to commercial establishments under numerous agreements it has with various broadcasters and programmers whose content it distributes. *Id.* ¶¶ 15–16.

Beginning in 2006, LLO was retained by DIRECTV to identify, investigate, and bring claims and/or civil actions against businesses or individuals throughout the United States who illegally acquired DIRECTV services, either by acquiring it without payment or by misrepresenting that they were individuals when, in fact, the services were actually being received and exhibited in a commercial establishment. *Id.* ¶ 17.  LLO's agreement to provide these services to DIRECTV was documented in a retainer agreement (the "Retainer Agreement") between LLO and DIRECTV dated on or about October 2, 2009. *Id.* ¶ 18.  Pursuant to the Retainer Agreement, DIRECTV retained LLO (defined as "ATTORNEYS" therein) to represent it "in the investigation and litigation of claims against individuals and entities for the commercial misuse and unauthorized exhibition of DIRECTV satellite programming services" in exchange for a contingency fee.  Dkt. No. 55-1 at 1.  The Retainer Agreement contained provisions with respect to the sharing of and payment for the costs of auditing and investigation fees incurred in the documentation of fraud, misuse and/or piracy through the efforts of an outside firm, Signal Auditing, Inc. *Id.* at 2.  It also required LLO to obtain DIRECTV's approval on a case-by-case basis prior to filing any lawsuit, *id.* at 1, and to maintain professional liability coverage with

minimum limits of $1 million "per occurrence," *id.* at 3.  The Retainer Agreement is terminable

by either party, with or without cause, on 14-days prior notice to the other party.  *Id.* at 2.  It is

signed by Julie C. Lonstein on behalf of LLO.  *Id.* at 4.

On or about February 15, 2019, Plaintiffs entered into a wind-down agreement (the

"Wind-Down Agreement") with AT&T Services, Inc. ("AT&T"), as successor to DIRECTV.

Compl. ¶ 20; *see also* Dkt No. 55-2.  The Wind-Down Agreement recognized that AT&T "has

retained LLO over the past twelve years to assist with detecting commercial misuse of

DIRECTV residential programming and converting commercially-misused residential accounts

to proper commercial accounts" but states that such program is being discontinued.  Dkt. No. 55-

2 at 1.  For a one-time non-refundable payment from AT&T, LLO agreed to continue to

represent AT&T during a one-year period following the effective date of the Wind-Down

Agreement.  *Id.* at 2–3.  The Wind-Down Agreement superseded all prior agreements between

the parties.  *Id.* § 12.01 ("The terms and conditions of this Agreement constitute the entire

agreement between the Parties with respect to the subject matter hereof, and this Agreement

supersedes all prior agreements, understandings, and representations by or between the Parties,

whether written or oral, to the extent they relate to the subject matter hereof").  It was signed on

February 15, 2019 on behalf of LLO by Wayne D. Lonstein and Julie C. Lonstein, and it was

signed on February 19, 2019 by AT&T.  Dkt. No. 55-2 at 12.

## II.    The Lawsuits Against DIRECTV and LLO

During the term of the Retainer Agreement, Plaintiffs were named, sometimes alongside

DIRECTV, in four lawsuits relating to the actions by Plaintiffs and DIRECTV in asserting

DIRECTV's programming rights (the "Actions").[1]

---

[1] The contents of the complaints in the Actions are properly before the Court for what they allege
but not for their truth, both because they are referred to and relied upon by the complaint, Compl.

### A.      The Roberson Action

On or about July 10, 2013, Brandon Roberson, Julie Roberson, and ELR Dreams, LLC, among others (the "Roberson Plaintiffs") commenced an action in Texas state court in the District Court of the 68th Judicial District of Dallas County, Texas ("Roberson Action").  Compl. ¶ 27.  The Roberson Plaintiffs are small-business owners who allege that, after signing up for what they understood to be the appropriate DirecTV service for their restaurant in Mesquite, Texas, they had their service cut off and received in June 2013 a "threatening" letter from LLO accusing them of fraud and of willfully violating a federal statute.  Dkt No. 49-1 ¶ 19.  The letter allegedly demanded that the Roberson Plaintiffs pay $15,000, which could be reduced to $12,000 if they signed up for a new commercial subscription for DirecTV.  *Id.*  The Roberson Action alleges claims of common law fraud, fraud by non-disclosure, conspiracy, and violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, against LLO and DirecTV.  *See* Dkt. No. 49-1.  The Roberson Action also alleges that after receiving the letter from LLO:

> Mr. Roberson researched this issue and discovered [DirecTV] and [LLO] have a history and pattern of authorizing and/or tacitly approving of: [DirecTV] installers signing up small businesses (café's, bars, etc.) under non-commercial packages without explaining that a commercial package even exists; waiting until the services is [sic] up and running; sending out an investigator; and then essentially blackmailing the customer to pay large fines and/or signing up for commercial service in order to reduce the fine.

*Id.* ¶ 21.

---

¶ 40 ("A comparison of the claims asserted in each Action demonstrates that the basic elements of each of the Actions is separate and distinct.") and thus are incorporated by reference, *see Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (summary order); *see also Wesco*, 847 F. App'x at 38 n.4 ("Because the Proxy is incorporated by reference into the complaint, we may properly take it into account at this motion to dismiss stage."), and because the Court can take judicial notice of the complaints as public records pursuant to Federal Rule of Evidence 201(b), *see Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000).

The Roberson Action alleges, upon information and belief, that:

[LLO] and [DirecTV] have willfully engaged in a pattern of either directing and/or tacitly approving of directing [DirecTV] callers to (and/or tacitly approving the pattern of customers going directly to) authorized retailers and/or installers to set up non-commercial service at small businesses without disclosing the difference between commercial and non-commercial accounts and without disclosing the fact that there even is more than one type of [DirecTV] service.

*Id.* ¶ 22.

The complaint in the Roberson Action goes on to allege, upon information and belief, that LLO and DirecTV "concocted and acted pursuant to a scheme" under which, after DirecTV induced a customer to sign up with a non-commercial service, LLO would "send an intimidating letter accusing the person of fraud and of violating US law, for which, despite these customers' honest protests that they had no idea that they had a non-commercial package at their small establishment, the customer is nevertheless statutorily obligated to pay" and "demanding large sums to make these daunting legal issues disappear." *Id.* The Roberson Action complaint also alleges that DirecTV and LLO are continuously engaged in this "coordinated scheme or plan to exact unearned fees from comparatively weak unsuspecting small commercial enterprises," *id.* ¶ 23, and that their conduct also is "a knowing violation of a prior settlement with the Attorney General [o]f Texas," *id.* ¶ 24. The Roberson Action complaint alleges that LLO had "either concocted the scheme . . . or tacitly approved and benefited from the scheme" and that it had "a reputation of raking in hefty paychecks through countless default judgments with factual scenarios almost analogous to the current one, some of which even raised suspicion with judges." *Id.* ¶ 36. The RICO claim alleges a pattern of activity that includes the extortion of other DirecTV customers including in Maine, Indiana, Ohio, and Texas. *Id.* ¶ 50. Among other relief, the Roberson Action sought multiple and exemplary damages from LLO and DirecTV including on the grounds that the pair had engaged in an illegal pattern of behavior and had "already

5

extracted unearned fees from unwary Texans and people from other states and will continue to do so unless stopped." *Id.* ¶ 59.

### B.        The Joaquin Action

On or about November 20, 2015, Angela Joaquin ("Joaquin") commenced an action in the United States District Court for the District of New Jersey ("Joaquin Action").  Compl. ¶ 28. According to her complaint, Joaquin is the owner of a beauty salon in New Brunswick, New Jersey.  Dkt No. 49-2 ¶ 26.  She alleges that after contracting to continue to receive the same satellite cable television services directly from DirecTV that she had previously obtained as part of a bundle of services, and without ever being told that the services were for a residential account, in August 2015, she received two successive letters from LLO that accused her of the unauthorized receipt and commercial display of DirecTV programming in violation of federal law and DirecTV customer agreements and threatened her with prosecution and/or litigation.  *Id.* ¶¶ 38–41, 44.  The second letter threatened prosecution and/or litigation if Joaquin did not pay $10,000 or $7,500 and become a business subscriber of DirecTV.  *Id.* ¶ 44.

Joaquin brings her case only against LLO, Julie C. Lonstein and Wayne Lonstein (referred to in her complaint as the "Lonstein Defendants") and Signal Auditing, Inc. and its Chief Operating Officer and brings her case as a class action on behalf of:

> All owners of New Jersey businesses who, at any time on or after September 9, 2010, were sent correspondence by the Lonstein Defendants regarding allegedly unauthorized use by the business of residential or non-commercial DirecTV satellite television services, and whose DirecTV service was installed at the business location and authorized for a residential or non-commercial account.

*Id.* ¶ 49.

She alleges that "[a]s a matter of policy and routine practice," the Lonstein Defendants send letters to businesses who have non-commercial subscriptions, accusing the businesses of violating federal law through the unauthorized receipt of DirecTV's "signal for commercial use,

threatening lawsuits and/or prosecution, and [demanding] large monetary settlements." *Id.* ¶ 19.

According to Joaquin's complaint, this is so even though most of those businesses were

authorized to receive DirecTV at their establishments using non-commercial subscriptions, and

the defendants knew or should have known this but acted with callous disregard of the fact that

the business was authorized to receive the service with a non-commercial subscription. *Id.*

¶¶ 20, 23–24. Joaquin alleges that the defendants have violated the New Jersey Consumer Fraud

Act and the New Jersey RICO statute. *See id.* The complaint attaches and relies in part on the

affidavit of an installer who installed a DirecTV satellite for an Indiana customer. *See id.*, Ex. A.

### C. The Perez Action

On or about August 4, 2016, a lawsuit was commenced in the United States District

Court for the Central District of California by Doneyda Perez ("Perez"), Danny and Marlys

Nissen ("the Nissens"), Joseph Angelo ("Angelo"), Gregory Laplante ("Laplante"), and Paul

Holt ("Holt") (the "Perez Action"). Compl. ¶ 25; Dkt. No. 49-3. According to the complaint in

the Perez Action, Perez was the owner of a small business in Garden Grove, California, Dkt. No.

49-3 ¶ 28; the Nissens are owners of a small business in Washburn, Iowa, *id.* ¶ 29; Angelo is the

owner of a small business in Newport Beach, California, *id.* ¶ 30; Laplante is the owner of a

small business in Redlands, California, *id.* ¶ 31; and Holt is the owner of a small business in

Fordyce, Arkansas, *id.* ¶ 32. They sue on behalf of a nationwide class of "[a]ll businesses and/or

business owners in the United States" who: were contacted or solicited by DirecTV or its

authorized agents; had residential DirecTV services improperly installed in their commercial

establishments; were audited by Signal Auditing, Inc.; and at any time from August 2012

forward received communications from LLO, Julie Lonstein, or Wayne Lonstein seeking money

for the alleged unauthorized use by their businesses of DirecTV licensed programming. *Id.* ¶ 69.

The Perez Action complaint names as defendants DirecTV Group Holdings, LLC, LLO, Julie C.

Lonstein, Wayne M. Lonstein, and Signal Auditing, Inc. *See* Dkt. No. 49-3.  It alleges a violation of the RICO Act.  *Id.*

The Perez Action alleges that, after DirecTV induces small businesses to purchase its satellite cable services at a special rate to broadcast in their commercial establishments and then internally designates the accounts as residential, LLO and the Lonsteins "initiate telephone calls and letters . . . to threaten these small business owners with credit reporting, 'owed' debts, and sham litigation unless they pay outrageous sums of money."  *Id.* ¶ 52.  The business owners are offered two choices—either pay a high flat rate and be "done with the matter" or pay a lesser flat amount and sign up for an extended contract for a DirecTV commercial account at a higher monthly rate on a continuous basis.  *Id.* ¶ 53.  The Perez Action complaint further alleges that LLO and the Lonsteins make "repeated factual and legal misrepresentations to the business owners" that they violated state and federal law, *id.* ¶ 56, and that the "conduct occurred consistently throughout the United States from at least four years preceding the filing of the initial complaint in this matter and continues to the present," *id.* ¶ 58.

### D.   The US Nails Action

Finally, on or about November 23, 2016, Thu Hone Thi Nguyen a/k/a Thu-Thuy Nguyen individually and d/b/a US Nails commenced a third-party action against LLO, Julie C. Lonstein, and Signal Auditing, Inc. in the United States District Court for the Northern District of Georgia ("US Nails Action").  Compl. ¶ 26; Dkt No. 49-4.  The US Nails Action is brought on behalf of a putative class that includes:

> [a]ll small business owners in the State of Georgia who, at any time on or after the day four years prior to the date on which this Class Action Counterclaim is filed [August 2016], purchased satellite cable television services provided by [DirecTV] for use in connection with business and were subsequently sent correspondence [by LLO and Julie Lonstein] regarding unauthorized use of said satellite cable television service.

Dkt No. 49-4 ¶ 79.  It alleges violations of the federal RICO Act and the Georgia Fair Business Practice Act.  Dkt. No. 49-4.

The allegations of the US Nails Action are similar to the allegations in the Roberson, Joaquin, and Perez Actions.  It claims that:  DirecTV targeted small business owners and sold them satellite service for their commercial establishments without telling them that the service was designated residential, *see generally id.*; that LLO and Julie Lonstein hire Signal Auditing, Inc. to send auditors/investigators to find consumers they believe may have been given residential and not commercial programming; and that LLO and Julie Lonstein, without the requisite investigation, sends threatening form letters to the Georgia consumers, requesting significant sums of money for alleged violations of the Federal Communications Act, 47 U.S.C. § 605.  Dkt. No. 49-4 ¶ 43.

The submissions before the Court reflect that all but the Perez Action have settled or dismissed.  *See* Dkt. No. 50 at 4; Dkt. No. 58 at 5; *see also* Dkt. No. 70 at 3, 10.  The Roberson Action was dismissed on or about August 17, 2015.  Compl. ¶ 27 n.2.  US Nails Action was dismissed on or about May 12, 2017.  *Id.* ¶ 26 n.1.  The parties agree that the Joaquin Action has been either settled or dismissed.  Dkt. No. 50 at 4; Dkt. No. 58 at 5.

### III.    The Insurance Dispute

EIC is an insurance company licensed and authorized to sell insurance in the State of New York.  *Id.* ¶ 6.  EIC issued Lawyers Professional Liability Insurance Policy, insurance policy number LA806580 in favor of LLO for insurance coverage during the policy period from June 1, 2013 to June 1, 2014 (the "EIC Policy").  *Id.* ¶ 22; Dkt. No. 8-1.

The EIC Policy provides coverage, pursuant to all of its terms, conditions and limitations, for "sums . . . which the Insured shall become legally obligated to pay as Damages as result of Claims first made against the Insured during the Policy Period . . . by reason of . . . a Wrongful

Act arising out of Professional Legal Services."  Dkt. No. 8-1 at 7.  The EIC Policy provides

coverage, after a $10,000 deductible for "Each Claim," which shall be paid by the Insured, up to

its $1,000,000 Each Claim Limit of Liability and its $3,000,000 Policy Aggregate.  *Id.* at 3, 10.

The EIC Policy contains the following relevant definitions:

A. **Claim** means a demand received by the Insured for Damages and shall include the service of suit or institution of arbitration proceedings against the Insured.

B. **Claim Expenses** means reasonable and necessary amounts incurred by the Company … in the defense of that portion of any Claim for which coverage is afforded under this policy, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, …
* * *
K. **Wrongful Act** means any act, error or omission by the Insured in rendering or failing to render Professional Legal Services for others.

J. **Professional Legal Services** means services rendered by an Insured (1) as a lawyer, as a notary public, as a mediator, as an arbitrator, as a title insurance agent, or as an administrator, conservator, executor, guardian, trustee other than a trustee in bankruptcy, or any other similar fiduciary, provided that such services are connected with and incidental to the Insured's profession as a lawyer and are performed by or on behalf of the Named Insured or any Predecessor Firm ….

*Id.* at 8–9.

The EIC Policy also contains a related-claims provision.  That provision of the policy

states:

E. **Multiple Insured, Claims and Claimants**:  The inclusion herein of more than one Insured in any Claim or the making of Claims by more than one person or organization shall not operate to increase the Limits of Liability stated in Item 4 of the Declarations. More than One Claim arising out of a Single Wrongful Act or Personal Injury or a series of related Wrongful Acts or Personal Injuries shall be considered a single Claim. All such Claims, whenever made, shall be treated as a single Claim.  Such single Claim, whenever made, shall be deemed to be first made on the date on which the earliest Claim arising out of such Wrongful Act is made or with regard to notice given to and accepted by the Company pursuant to Section Claims B., Discovery Clause, on the date within the Policy Period on which such notice of potential Claim is first received by the Company.

*Id.* at 11.

Plaintiffs tendered and timely provided written notice of the Actions to EIC, which provided for Plaintiffs' legal representation in the Actions.  Compl. ¶¶ 29–30.  By letter dated July 31, 2020, however, EIC notified Plaintiffs that the policy limit of $1 million was exceeded by the payment of legal fees and/or expenses and that its obligations pursuant to the EIC Policy had expired (the "July 31, 2020 Letter").  *Id.* ¶ 32.  The July 31, 2020 Letter asserted that each of the Actions arose out of a series of related Wrongful Actions and that, as a result, the Actions should be treated as a single claim/occurrence as defined in the EIC Policy, subject to the $1 million limit of liability.  *Id.* ¶ 33.  At the time of the July 31, 2020 Letter, the law firm of Lewis Brisbois was actively engaged as Plaintiffs' counsel in the Perez Action and the Joaquin Action. *Id.* ¶¶ 30, 34.  Pursuant to the July 31, 2020 Letter, EIC refused to pay invoices from Lewis Brisbois in the amount of $42,153.05.  *Id.* ¶ 43.  Lewis Brisbois also has remitted to Plaintiffs invoices for an additional $59,604.30, for defense costs, *id.* ¶ 44, and it is claiming the approximate sum of $200,000 remains due and outstanding in connection with its representation of LLO in the Actions, *id.* ¶ 45.

## PROCEDURAL HISTORY

Plaintiffs commenced this action by complaint filed against EIC and Markel on November 18, 2020.  Dkt. No. 1.  The complaint brought claims for breach of contract and breach of the duty of good faith and fair dealing against these defendants for failure to pay defense costs under the EIC Policy.  *Id.*  It sought a declaratory judgment that defendants were obligated to defend and indemnify Plaintiffs in the Actions up to the EIC Policy's aggregate limits of liability of $3 million, as well as specific performance for the same.  *Id.*  On November 20, 2020, LLO filed an amended complaint against EIC and Markel containing the same causes of action.  Dkt. No. 8.

On May 10, 2021, Plaintiffs filed the second amended complaint, which is the operative complaint in this action (the "Complaint"), adding AT&T as a defendant.[2]  On June 28, 2021, EIC and Markel filed this motion to dismiss the Complaint for failure to state a claim for relief. Dkt. No. 48.  Plaintiffs filed a memorandum of law in opposition to that motion on July 16, 2021, Dkt. No. 58, and EIC and Markel filed a reply memorandum of law in further support of the motion to dismiss on July 30, 2021, Dkt. No. 60.  AT&T filed a motion to compel arbitration on July 6, 2021.  Dkt. No. 51.  Plaintiffs filed a response in opposition to the motion to compel arbitration on July 28, 2021, Dkt. No. 59, and AT&T filed a reply memorandum of law in further support of its motion to compel arbitration on August 10, 2021, Dkt. No. 62.[3]

## STANDARD OF REVIEW

"[I]nsurance contracts are subject to the general rules of contract interpretation." *J.P. Morgan Secs. Inc. v. Vigilant Ins. Co.*, -- N.E.3d --, 2021 WL 5492781, at *3 (N.Y. Nov. 23, 2021); *see Burlington Ins. Co. v. NYC Transit Auth.*, 79 N.E.3d 477, 481 (N.Y. 2017) ("An insurance agreement is subject to principles of contract interpretation") (quoting *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 37 N.E.3d 78, 80 (N.Y. 2015)).  Absent a violation of public policy, "insurance contracts are typically 'enforced as written.'" *J.P. Morgan Secs.*, 2021 WL 5492781, at *3 (quoting *Matter of Viking Pump, Inc.*, 52 N.E.3d 1144, 1151 (N.Y. 2016)).  "[T]he specific language used in the relevant policies . . . 'must be interpreted according to common speech and consistent with the reasonable expectation of the average

---

[2] Plaintiffs attempted to file the Second Amended Complaint on April 19, 2019, after the deadline set by the Court for the filing of the amended complaint.  Dkt. Nos. 22, 26.  The Court gave Plaintiffs leave to refile by May 11, 2011.  Dkt. No. 26.  By opinion and order dated January 6, 2022, the Court granted AT&T's motion to compel arbitration and stayed this action as to it.  Dkt. No. 67.

[3] On August 30, 2021, this case was reassigned from the Hon. Mary Kay Vsykocil to the Hon. Alison J. Nathan.  On December 10, 2021, the case was reassigned to the undersigned.

insured' at the time of contracting, with any ambiguities construed against the insurer and in favor of the insured." *Id.* (quoting *Dean v. Tower Ins. Co. of N.Y.*, 979 N.E.2d 1143, 1145 (N.Y. 2012)). "As with the construction of contracts generally, 'unambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court.'" *Vigilant Ins. Co. v. Bear Stearns Cos., Inc.*, 884 N.E.2d 1044, 1047 (2008) (quoting *White v. Continental Cas. Co.*, 878 N.E.2d 1019, 1021 (2007)). "[C]ourts should read a contract as a harmonious and integrated whole to determine and give effect to its purpose and intent." *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 92 N.E.3d 743, 747 (N.Y. 2017) (internal quotation marks and citations omitted). "Courts may not, through their interpretation of a contract, add or excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract under the guise of interpreting the parties' own agreements." *Id.* at 748. "In that regard, a contract must be construed in a manner which gives effect to each and every part, so as not to render any provision 'meaningless or without force or effect.'" *Id.* (quoting *Ronnen v. Ajax Elec. Motor Corp.*, 671 N.E.2d 534, 536 (N.Y. 1996)); *see also Charter Oak Fire Ins. Co. v. Zurich Am. Ins. Co.*, 462 F.Supp.3d 317, 322 (S.D.N.Y. 2020) (same).[4]

---

[4] Plaintiff argues that the limits of liability should be considered to be an exclusion and that EIC therefore bears the burden of showing that the exclusion applies. Dkt No. 58 at 10. However, "New York law does *not* construe language limiting the amount or extent of liability as an exclusion." *Caitlin Specialty Ins. Co. v. QA3 Financial Corp.*, 629 F. App'x 127, 130 (2d Cir. 2015) (summary order) (citing *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 991 N.E.2d 666, 671 (N.Y. 2013)). "[A] limit[] of liability is *not* an exclusion, and New York law does not permit [the Court] to find otherwise." *Id.* at 131; *see N.Y. Univ. v. Factory Mut. Ins. Co.*, 374 F. Supp. 3d 315, 323 n.3 (S.D.N.Y. 2019) (same). *David v. American Home Assurance Co.*, 1997 WL 160367 (S.D.N.Y. Apr. 3, 1997), is not to the contrary. In that case, which predated the New York Court of Appeals' decision in *Roman Catholic Diocese*, the court was interpreting a policy exclusion and not a limitation of liability.

**DISCUSSION**

EIC makes a single argument in support of dismissal of each of the causes of action in the Complaint.  It argues that the Complaint fails to state a claim because the four Actions all arise from "related" "Wrongful Acts" and, as a result, they were subject to the EIC Policy's Limitation of Liability of $1,000,000 for a single claim.  Because EIC paid up to that amount, it argues, Plaintiffs' Complaint fails to state a claim for breach of contract or for a breach of the duty of good faith and fair dealing.  Plaintiffs disagree and argue that the Actions each allege distinct Wrongful Acts and that it therefore is entitled to $1 million in coverage for each Action, subject to the $3 million aggregate Limits of Liability coverage.[5]

In addressing an insurance contract dispute, a court asks two separate questions: (1) are "the provisions at issue . . . unambiguous as a matter of law"; and (2) if so, what are their "plain and ordinary meaning[s]" as applied to the facts at issue in the lawsuit.  *Nomura Holding Am., Inc. v. Federal Ins. Co.*, 45 F. Supp. 3d 354, 364 (S.D.N.Y. 2014), *aff'd*, 629 F. App'x 38 (2d Cir. 2015) (summary order).  In addressing whether the Actions are related, the court engages in a "side-by-side review of the underlying claims."  *Nomura Holding*, 629 F. App'x at 40.

---

[5] Plaintiffs frame their claims as a breach of contract and a breach of the duty of good faith and fair dealing.  New York law is clear, however, that where a contract addresses the matter in dispute and the factual basis for the breach of contract and the breach of the duty of good faith and fair dealing are the same, no claim for breach of the duty of good faith and fair dealing lies. *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) ("Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract.  New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 434 n.17 (2d Cir. 2011) (applying New York law and explaining that "[b]ecause [plaintiff's] claim for breach of the implied covenant of good faith and fair dealing . . . is based on the same facts as its claim for breach of contract, it should have been dismissed as redundant").  Plaintiffs do not assert a claim of bad-faith liability.  *See Scottsdale Ins. Co. v. McGrath*, 2021 WL 3077578 (S.D.N.Y. July 19, 2021) (discussing elements of such a claim).  Accordingly, the claim for breach of the duty of good faith and fair dealing is dismissed with prejudice.

In *Nomura Holding*, the Second Circuit addressed the first question with respect to remarkably similar language as is present in this case. The policy language in *Nomura Holding* defined "Related Claims" as "all Claims for Wrongful Acts based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events." *Nomura Holding*, 45 F. Supp. 3d at 360. The Related Claims Provision here defines a Claim "arising out of . . . a series of related Wrongful Acts [as] a single Claim" and states "such Claims, whenever made, . . . as a single Claim [which] shall be deemed to be first made on the date on which the earliest Claim arising out of such Wrongful Act is made." Dkt No. 8-1 at 11. Both clauses require interpretation of the term "related." The differences in the clauses are immaterial for the purposes relevant here. In *Nomura Holding*, the term "related" qualified "facts, circumstances, situations, transactions or events." Here the term "related" qualifies "Wrongful Act," which is defined to "mea[n] any act, error or omission by the Insured in rendering or failing to render Professional Legal Services for others." *Id.* at 9.

The district court in *Nomura Holding* found the policy language to be unambiguous. It was not subject to more than one reasonable interpretation. *Nomura Holding*, 45 F. Supp. 3d at 364, 368. The Second Circuit did not disagree. Although the court quarreled with the district court's interpretation of the policy language and its application to the facts at issue, it did not disagree with either the court's holding that the language was unambiguous or its bottom-line conclusion that the claims at issue were related. *Nomura Holding*, 629 F. App'x at 40; *see also Nomura Holding*, 45 F. Supp. 3d at 364, 368.

*Nomura Holding* is dispositive here with respect to whether the contract language is unambiguous. In *Nomura Holding*, the Circuit affirmed that no ambiguity existed with respect to

the question of whether facts or circumstances were related.  629 F. App'x at 40.  The same

result logically follows here where the question is whether "act[s], error[s] or omission[s] by the

Insured in rendering or failing to render Professional Legal Services for others," are related.  Dkt.

No. 8-1 at 9; *see also Zahler v. Twin City Fire Ins. Co.*, 2006 WL 846352, at *6–7 (S.D.N.Y.

Mar. 31, 2006) (holding that "Interrelated Claims" provision of insurance policy is unambiguous

and ruling in favor of insurer); *cf. Gregory v. Home Ins. Co.*, 876 F.2d 602, 603–04 (7th Cir.

1989).[6]

The second question relates to the application of *Nomura Holding:* whether the Actions

are related within the meaning of the EIC Policy.  Plaintiffs rely on the allegations of the

complaints in the four Actions.  They allege "[a] comparison of the claims asserted in each

Action demonstrates that the basic elements of each of the Actions is separate and distinct."  Dkt.

No. 27 ¶ 40.  They claim that the allegations of events in each of the Actions "occurred during

different times with distinct and different facts and allegations," *id.* ¶ 37, that the parties in each

of the Actions are not related, *id.* ¶ 38, and that "[t]here is no factual nexus between the claims

asserted in each of the Actions," *id.* ¶ 39.  They do not identify differences in the facts alleged in

the Actions that they believe to be material or significant, or any other basis for concluding that

the Actions are unrelated other than what appears on the faces of the complaints.

EIC meets Plaintiffs on the grounds they allege.  EIC argues, based on the faces of the

complaints, that the Actions are related, emphasizing that, based on those allegations, they each

---

[6]  Plaintiffs rely on Judge Preska's decision in *David v. American Home Assurance Co.*, holding
that language of "related" as used in an insurance policy was ambiguous, but *David* predated
*Nomura Holding*.  1997 WL 160367.  Indeed, after *David*, Judge Preska held that language in a
Prior Notice Exclusion defining a claim to include "interrelated wrongful acts" was unambiguous
and granted judgment on the pleadings to the insurer.  *See Zahler v. Twin City Fire Ins. Co.*,
2006 WL 846352 (S.D.N.Y. Mar. 31, 2006).

arise out of LLO's acts in the course of performing a single type of service, for a single client (DIRECTV), pursuant to a single retainer agreement.  Dkt. No. 50 at 10.  It argues that the Actions "arise out of nearly identical and overlapping allegations of a series of related Wrongful Acts by Lonstein beginning prior to 2014 and continuing at the time each Underlying Action was filed," that each complaint alleges that LLO "was engaged in a single, nationwide scheme with a single goal: to intimidate and extort money from similarly situated small business owners who were streaming DIRECTV programming at their business locations under residential rather than commercial accounts," and that LLO's conduct, as alleged in the Actions, "followed the very same pattern."  *Id*. at 5.

The Court draws guidance from the language of the EIC Policy and decisions applying similar language.  The plain language of the EIC Policy makes clear that "Claims" need not be based on the same legal theories or be based on the same "acts, errors or omissions" by LLO to be considered "Related."  The Related Claims Provision states that "[m]ore than One Claim arising out of a Single Wrongful Act . . . shall be considered a single Claim" and that "[a]ll such Claims, whenever made, shall be treated as a single Claim."  Dkt. No. 8-1 at 11.  It follows then, that the assertion of different legal bases for recovery as a result of a single set of acts, errors, or omissions would not result in there being more than one Claim and more than one limit of liability.  To conclude otherwise would deprive the policy language of any meaning.  The critical question is not the nature of the legal allegation but whether it arises out of a single or related set of Wrongful Acts.  Equally clear, the fact that the Claims are made at different times does not prevent them from being related.  Any contrary interpretation would make the Related Claims Provision illusory—the provision treats claims that are made at different times as a single Claim as long as they are "related."  Under the Related Claims Provision, it also is not dispositive that

the Claims may be brought by different persons.  The clause provides that "the making of Claims by more than one person or organization shall not operate to increase the Limits of Liability." *Id.*  Thus, the fact that two or more persons may have been injured as a result of a single "act, error or omission" by LLO does not entitle the insured to more than $1 million of coverage for that act.  That separate persons may have been injured as a result of related acts, errors or omissions does not itself entitle the insured to more than the single Limit of Liability of $1 million per Claim.

    In interpreting similar language, courts have focused on the similarity of the acts giving rise to a claim that are alleged to be related and whether they arise from common facts or logically connected facts.  In *Nomura Holding*, for example, the insurer defendant argued that each of five lawsuits were related because they "contain[ed] overlapping (and frequently identical) factual allegations, arising from strikingly similar circumstances, alleging similar claims for relief."  45 F. Supp. 3d at 370.  The court accepted that argument and held that the insurer was entitled to judgment on the basis that the five lawsuits alleged a single set of related claims.  *Id.* at 375.  Each of the actions at issue in *Nomura Holding* arose as a result of the conduct of Nomura Holding—the insured—in either sponsoring, underwriting, or acting as depositor for a securitization of residential mortgage-backed securities ("RMBS"), which contained identical misrepresentations upon which the investors in those actions alleged that they relied.  *Id.* at 371–72.  Even though the actions were brought by different investors who purchased different RMBS at different times based upon different—but substantively nearly identical—offering documents, the court held that the actions were related.  It reasoned: "while the identities of the plaintiffs vary, each is a sophisticated investor that relied upon allegedly

material (and substantively identical) misstatements in the offering documents and was harmed

as a result." *Id.* at 373. The court continued,

> although the Underlying Actions allege claims in connection with different
> offerings, the alleged misstatements in those offering documents are largely
> identical. And while the relevant offerings occurred over a roughly two-year
> period, Nomura has introduced no evidence that the differences in date mattered;
> indeed, the Underlying Actions make no such allegation.

*Id.*

Although the Second Circuit did not agree with the test the district court applied in

interpreting the related-claims provision there, it nonetheless affirmed the district court's grant of

summary judgment for the insurer "for substantially the same reasons set forth by the district

court" and independently concluded that the claims were related. *Nomura Holding*, 629 F.

App'x at 39–40.

In *Cushman & Wakefield, Inc. v. Illinois Nat'l Ins. Co.*, 2018 WL 1898339 (N.D. Ill. Apr.

20, 2018), the question was whether a series of four claims brought against various subsidiaries

of Cushman & Wakefield, Inc. ("Cushman") over a period of four years in connection with

appraisals prepared by Cushman of the value of large, master-planned residential communities

("MPCs") should be considered related under the terms of professional liability insurance issued

to Cushman. The four specific claims (arising either from demands or lawsuits) were made at

different times by different plaintiffs in different forums alleging different theories but involved

many of the same properties and appraisals. *Id.* at *5, *18. The language of the policy provided

that "[f]or purposes of the Limits of Liability, a series of continuous, repeated or *interrelated*

*Wrongful Acts shall be considered as one Wrongful Act*," *id.* at *4, and, as here, *"*Wrongful Act"

was defined to mean "[a]ny actual or alleged act, error or omission committed in connection with

the conduct of the Insured's Professional Services," *id.* at *3. The court noted that each of the

claims was based on Cushman's use of the same allegedly flawed appraisal methodology, each

involved overlapping properties, and each alleged that Cushman had conspired with the banks that financed the MPCs "to intentionally overvalue the MPCs so [a bank] could generate fees and that the . . . appraisals were inherently misleading." *Id.* at *5.  The plaintiffs in one of the actions claimed that the scheme was repeated at various properties around the country.  *Id.*  Applying New York law, *id.* at *11, the court first held that the language of the provision was unambiguous, *id.* at *16, and then held that the underlying claims were related because they "contain[ed] overlapping factual allegations and ar[ose] from strikingly similar circumstances," involving "the same alleged course of conduct, during the same time period, and involve[ing] many of the same MPCs," *id.* at *18.  The court recognized that "each appraisal was a different work product, providing a unique valuation analysis and conclusion by a different Cushman employee."  *Id.* at *19.  But it held, "the claims need not 'involve precisely the same parties, legal theories, Wrongful Acts, or requests for relief.'"  *Id.* at *17 (quoting *Zunenshine v. Exec. Risk Indem. Inc.*, 1998 WL 483475, at *5 (S.D.N.Y. Aug. 17, 1998)).

Under New York law, an insurer has a duty to defend as long as there is any "possible factual or legal basis on which the insurer might eventually be obligated to indemnify."  *Charter Oak*, 462 F. Supp. 3d at 323.  Plaintiffs have failed to identify such a basis here.  Plaintiffs rely solely on the allegations of the complaints in the Actions.  However, "a side-by-side review of the factual allegations in the relevant complaints" reveals "much more than a 'tenuous factual overlap.'"  *Cushman & Wakefield*, 2018 WL 1898339, at *17–18 (quoting *Glascoff v. OneBeacon Midwest Ins. Co.*, 2014 WL 1876984, at *6 (S.D.N.Y. May 8, 2014)).  Each of the Actions allege a single overarching scheme by LLO, sometimes with DirecTV or with the investigator for LLO, over an overlapping period from 2010 to 2015, to defraud small-business owners using the same means through the identical or nearly identical misrepresentations.  The

20

Actions each are based on a single retention of LLO by the same single client pursuant to which LLO engaged in a single prearranged course of conduct involving the same types of victims through the same misrepresentations and illegal conduct.  The Roberson Action alleges that, as of 2013, LLO, with DirecTV, "concocted and acted pursuant to a scheme"  pursuant to which LLO would "send an intimidating letter accusing the person of fraud and of violating US law, for which, despites these customers' honest protests that they had no idea that they had a non-commercial package at their small establishment, the customer is nevertheless statutorily obligated to pay" and "demand[] large sums to make these daunting legal issues disappear." Dkt. No. 49-1 ¶ 22.  The Joaquin Action alleges that, from 2010 to 2015, LLO "[a]s a matter of policy and routine practice," would send letters to businesses who have non-commercial subscriptions accusing them of violating federal law "through the unauthorized receipt of DirecTV's signal for commercial use, threatening lawsuits and/or prosecution, and [demanding] large monetary settlements" even though most of those businesses were authorized to receive DirecTV at the business establishment using a non-commercial subscription and that LLO knew or should have known and acted with callous disregard of the fact that the business was authorized to receive the service with a non-commercial subscription.  Dkt. No. 49-2 ¶¶ 19–20, 23–24.  The Perez Action alleges that from 2012 to 2015, LLO would "initiate telephone calls and letters . . . to threaten these small business owners with credit reporting, 'owed' debts, and sham litigation unless they pay outrageous sums of money."  Dkt. No. 49-3 ¶ 52.  The US Nails Action alleges that, from 2012 to 2016, LLO, without any form of investigation, sent threatening form letters to the Georgia consumers, requesting significant sums of money for alleged violations of the Federal Communications Act, 47 U.S.C. § 605.  Dkt. No. 49-4 ¶ 43.

Neither the fact that the Actions are brought by different persons, nor the fact that they were filed at different times make them unrelated.  Although the Actions are brought by different individuals, they seek relief on behalf of overlapping groups of small-business owners based on overlapping sets of facts.  Roberson is an individual action, but they seek punitive damages based, in part, on the injury to other small businesses.  Joaquin and US Nails bring claims on behalf of classes of small businesses in their states—New Jersey and Georgia respectively—but they do not allege a scheme limited to those states.  And Perez brings a nationwide class action on behalf of persons who are in the classes in the Joaquin and US Nails Action.  The differences in the statutes and the claims are virtually non-existent—each alleges claims under either federal or state RICO statutes and alleges that LLO committed fraud by the same misrepresentations.  Each Action contains allegations specific to the named plaintiff bringing that action, but Plaintiffs do not allege facts "that these identified differences matter[], i.e., that they were anything other than differences in name only."  *Nomura Holding*, 45 F. Supp.3d at 373.  Thus, the allegations of the complaints themselves undermine Plaintiffs' claim that there is no factual nexus among the Actions.

The conclusion that the Complaint fails to state a claim for relief does not, as Plaintiffs argue, make the guarantee to them of a $3 million aggregate limit of liability illusory.  The claims are not related solely because each is based on the same alleged error committed by Plaintiffs, as would happen if a law firm was in error on a single proposition of law and that error affected more than one representation.  In that instance, each claim could stand alone—no one claim of malpractice would rest upon the viability of any other claim of malpractice.  The claims are related because, based on the allegations of the complaints, Plaintiffs engaged in a single prearranged course of fraudulent conduct that affected more than one individual, and the viability

of the claims in each case rests on the notion that the wrongdoing is not a one-off.  Each claim

against Plaintiffs in one case of fraud or racketeering or unfair business practices would depend

on the viability and success of the allegations of similar conduct made in the other cases.

Nor does the result in this case necessarily give a third party the exclusive ability to

define a claim and, by alleging single course of conduct, thereby deprive an insured of the ability

both to defend itself against the claim and to establish that the claims are not related.  "[T]he

duty to defend derives, in the first instance, not from the complaint drafted by a third party, but

rather from the insurer's own contract with the insured."  *Fitzpatrick v. Am. Honda Co.*, 575

N.E.2d 90, 93 (N.Y. 1991).  The insurer is thus required to provide a defense not just when the

four corners of a complaint give rise to the possibility that it might be obligated to indemnify the

insured but also "when it has actual knowledge of facts establishing a reasonable possibility of

coverage."  *Id.*; *see Charter Oak*, 462 F. Supp. 3d at 324.  Plaintiffs here, however, have relied

solely on the face of the complaints and have not identified any information in the possession of

the insurer that would suggest that the related-claims provision does not apply and that there is a

possibility that EIC will be required to indemnify.

## CONCLUSION

For the reasons stated, the motion to dismiss is GRANTED.  The Second Circuit has

expressed a preference for cases to be dismissed without prejudice after a decision on the first

motion to dismiss.  Accordingly, the Court will dismiss Plaintiffs' claims for breach of the duty

of good faith and fair dealing and against Markel with prejudice but will dismiss the claim for

breach of contract against EIC without prejudice.[7]  If Plaintiffs do not file an amended complaint

---

[7] Defendants also move to dismiss Markel as a defendant.  Markel is not an issuer of the EIC
Policy and is not alleged to have engaged in any conduct giving rise to a cause of action.
Plaintiffs do not defend their claims against Markel and therefore are deemed to have abandoned
those claims.  *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 2014 WL

without 30 days of the date of this Opinion and Order, the Court will dismiss the case with

prejudice.

The Clerk of Court is respectfully directed to close Dkt. No. 48.

SO ORDERED.

Dated: February 2, 2022
       New York, New York    _____
                                        LEWIS J. LIMAN
                                 United States District Judge

---

4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage, where review is
limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's
arguments in support of dismissing that claim."); *Sullivan v. City of New York*, 2015 WL
5025296, at *4 (S.D.N.Y. Aug. 25, 2015) (explaining that a court "could properly deem a
represented party to have abandoned claims if, in opposing a motion to dismiss multiple claims,
it addressed only some of them").  Accordingly, the claims against Markel are dismissed with
prejudice.